The plaintiff seeks to recover from the defendant damages for a breach of an alleged contract to effect redemption on plaintiff's behalf of his land from a mortgage foreclosure sale. The jury returned a verdict in favor of the defendant. The plaintiff moved the court below for a new trial, which was denied. From a judgment of dismissal, the plaintiff has appealed.
From the record it appears that in the month of December, 1919, the plaintiff, F.O. Hellstrom, was the owner of a tract of land comprising some 154 acres, described as the south-west quarter of the northwest quarter, and lot four, in section four, and the south-east quarter of the north-east quarter, and lot one, in section five, township one hundred forty-seven, range thirty-nine, west of the fifth principal meridian, in Polk county, Minnesota, situated some six miles from the city of Fosston. On December 10, 1919, the plaintiff executed to the defendant bank a second mortgage upon this property for $3,000. A first mortgage of $1,500 upon the premises being held by the Capital Trust Savings Bank of St. Paul. In June, 1921, plaintiff not being able to pay the first mortgage, the same was foreclosed, and a sheriff's certificate of sale issued, the redemption period expiring about the 24th of June, 1922. Partial payments had been made by the plaintiff on the $3,000 mortgage to the defendant bank, but in June, 1922, there remained an unpaid balance of about $1,100. The plaintiff failed to redeem from the foreclosure made by the Capital Trust Savings Bank of St. Paul, and in June, 1922, the defendant, in order to protect its second mortgage, effected a redemption and secured a sheriff's deed to the property.
The plaintiff in his complaint alleged, and also contended at the trial, that in the month of May, 1922, he entered into an oral agreement with *Page 169 
the defendant bank, through its president, Mr. F.A. Lahr, whereby it was covenanted and agreed by the defendant that the defendant would redeem the premises from the foreclosure sale under its second mortgage and hold the title in trust for the benefit of the plaintiff, and that the defendant would negotiate and accept from the plaintiff as redemption payment a first mortgage loan in the sum of $1,800 and in addition thereto a second mortgage from the plaintiff for the balance remaining unpaid on the first and second mortgages. That the plaintiff in good faith relied upon such agreement and took no further steps to effect a redemption of the property. That on the 29th day of June, 1922, Mr. E.T. Burke, acting as attorney for the defendant bank, notified plaintiff that the mortgages and notes under this agreement were ready to be executed and asked him to go to the bank and sign the same. That the plaintiff went to the bank and looked the papers over, that they appeared to be two mortgages and notes ready for his signature. That Mr. E.V. Lahr, the cashier of the bank, and Attorney E.T. Burke, were present. His testimony as to what occurred at this meeting is as follows: "I said to Mr. Lahr: `These papers seem to be all right as far as I can see, but I have another proposition which I will give you which you can consider. If you want the money instead of these notes and mortgages I can pay you off in full the entire amount.' `Well, of course,' he says, `we would rather have the money.' He says, `How soon are you going to get that money?' I said that money can be had in two hours and a half. And he said, `The sooner the better, and the better we will be satisfied.' So I went ahead and made my arrangements with Mr. Wilson. He was cashier of the Merchants National Bank of Mandan. I called him over the long distance 'phone, told him that I could make that arrangement, and if the bank still was going to go through with the deal with me that we had talked, to come over right away, that we had to have the money right away and be able to settle with them in order to get the redemption." The plaintiff claims that Mr. Wilson came over with a cashier's check, that he tendered the amount of money necessary to redeem to E.T. Burke, attorney for the defendant bank, and that it was refused, that the bank was closed and Mr. Lahr not to be found, and that the defendant, instead of complying with the terms of this agreement, took title to itself and refused to permit the plaintiff to redeem. That the premises were reasonably *Page 170 
worth at the time of the expiration of the period of redemption, $11,200, and that the plaintiff has been damaged by reason of the breach of such contract in the sum of $8,428, less the sum of $2,500, the amount due upon the foreclosure sale and defendant's second mortgage.
The defendant bank, through its officers, in its answer, and at the trial, specifically and positively denied the making of any such agreement, but admitted that after the period of redemption had expired, and about the 29th of June, 1922, the bank agreed to deed the land to the plaintiff upon his paying the full amount due on the first and second mortgages, and upon his agreeing to dismiss certain litigation then pending between the plaintiff and the defendant in the district court of Burleigh county. That the plaintiff refused to accept this proposition and that later, and in the month of August, 1922, they sold the land to the Merchants National Bank of Mandan for less than the First Guaranty Bank had invested in the first and second mortgages.
The plaintiff has assigned sixteen specifications of error. They all relate to the admission or rejection of testimony.
The first six assignments may be considered together, as they relate entirely to the cross-examination of the witness George F. Wilson, the cashier of the Merchants National Bank of Mandan. Mr. Wilson was called as a witness by the plaintiff for the purpose of showing, apparently, that Mr. Wilson had come to Bismarck from Mandan on the evening of June 29th, 1922, for the express purpose of paying to the defendant bank the amount of money necessary to effect a redemption of the mortgages held by the defendant. On cross-examination this witness was permitted to testify over the objection of the plaintiff that on the 29th of June, 1922, the plaintiff, Hellstrom, was indebted to the Merchants National Bank of Mandan in the sum of $5,000, and that the Mandan Bank was not so much interested in advancing money to Mr. Hellstrom to effect a redemption as it was to secure whatever equity there might be in the Polk county land as additional security to its own claims against Mr. Hellstrom, and that later, and in the month of August, 1922, the bank actually did purchase this land from the First Guaranty Bank for a consideration of $3,400, clear of incumbrance.
The plaintiff strenuously contends that this was prejudicial error, that this cross-examination went far beyond the scope of the examination in chief, went into matters that were entirely irrelevant to any *Page 171 
question asked the witness, Wilson, on direct examination, and that such evidence adduced on cross examination could not but prejudice the jury against the plaintiff for the reason that the jury might naturally conclude that the defendant Bank not having made any profit on the transaction, that therefore it should not be mulcted in damages.
We have analyzed the testimony of Mr. Wilson very carefully. Just prior to calling Mr. Wilson to the stand, the plaintiff had called for cross-examination under the statute, Mr. E.V. Lahr, cashier of the defendant bank, and had examined him minutely as to all transactions between the bank and Mr. Hellstrom in reference to the $3,000 mortgage on the Polk county land and the redemption of the same, and also asked the witness Lahr these questions:
Q. Your bank came into possession of the title to this land, did they not?
A. Yes, sir.
Q. Afterwards you sold that land, did you not?
A. Yes, sir.
Q. And disposed of it?
A. Yes, sir.
The witness Wilson testified, in substance, on direct examination that he was cashier of the Merchants National Bank of Mandan. That on the 29th of June, 1922, and prior thereto, he had some business dealings with the plaintiff, Hellstrom, in reference to the land involved in this litigation, and especially with reference to giving him, or securing for him, the money with which to redeem this land from the different mortgages upon it. That Mr. Hellstrom had come to him and said that he was able to do business with the First Guaranty Bank and wanted to know if the Mandan Bank was ready to furnish the money. That the witness told him that they would. That he had had some idea of what was against the land, and that he told him he would furnish enough to make the redemption or get the land. That he came over to Bismarck the evening of June 29th, prepared to furnish to the bank the payment of the amount due to redeem the land and the mortgages against it. That he had an abstract of title to the land down to the year 1906. *Page 172 
On cross-examination the witness admitted that he did not see any of the officers of the bank on the evening of June 29th, nor Mr. Burke, attorney for the bank. That he had brought over a blank cashier's check, which was not filled in for any amount; that he had brought no cash; that the cashier's check was not signed; and that he did not learn while in Bismarck the amount necessary to fill it in, and that it never was filled in; and that the bank had never actually advanced any cash to Mr. Hellstrom.
The question is, did the trial court exceed the bounds of sound discretion in permitting the cross-examination of the witness Wilson as to the matters above outlined, over the objection of plaintiff?
It is undoubtedly the American rule that cross-examination can only relate to facts and circumstances connected with the matters stated in the direct examination of the witness, and that if a party wishes to examine a witness as to other matters he must do so by making the witness his own. Jones, Ev. 2d ed. p. 1038.
However, it is also the rule:
"Where a general subject is entered upon in the examination-in-chief, the cross-examining counsel may ask any relevant question on the general subject, and is not bound to follow the line of examination pursued by the adverse party. It is sometimes held that, even as to matters purely defensive, it rests in the sound discretion of the court to allow the defendant to cross-examine the plaintiff's witnesses. Although there are instances in which it has been held error, even in civil actions, to allow cross-examination as to matters not connected with the examination-in-chief, yet it is the prevailing rule that very much must be left to the discretion of the presiding judge in the determination of this question. It has been said that, `unless a trial court should so far overstep the bounds as to admit that in cross-examination which clearly has no connection with the direct testimony, an appellate court would not be justified in reversing a judgment for such cause, especially where the cross-examination is upon facts competent to be proved under the issues of the case.'" Jones, Ev. 2d ed. p. 1040.
"The general rule requiring testimony to be confined to the point in issue is much more liberally construed in the cross-examination of witnesses than in their examination-in-chief. While the party who produces a witness vouches for his credibility, the cross-examiner sustains *Page 173 
no such relation to the witness. He is at liberty, and is often compelled to attack the credibility of the witness, and, for that purpose, must be allowed wide latitude in asking questions which would otherwise be wholly irrelevant to the issue. For the purpose of testing the credibility of a witness, it is permissible to investigate the situation of the witness with respect to the parties and to the subject of the litigation, his interest, his motives, inclinations and prejudices." Jones, Ev. 2d ed. § 1045.
In 40 Cyc. p. 2480, the rule is again laid down:
"In the interests of truth and justice it is usual to allow considerable latitude in the examination of an adverse witness, especially where the witness is interested in the litigation, or is hostile to the cross-examining party; and as a general rule any matter which tends either to elucidate or to discredit the testimony given by the witness is a proper subject of cross-examination. Accordingly a party has a right upon cross-examination to draw out anything which would tend to contradict, weaken, modify, or explain the evidence given by the witness on his direct examination, or any inference that may result from it tending to support in any degree the opposite side of the case."
In applying these rules to the testimony of the witness Wilson, we must remember that he was called out of order by the plaintiff, as naturally his testimony, to be logical, should follow that of the plaintiff himself. It appears to us that any question relating to the particular subject-matter which would show the interest or bias of the witness Wilson, and his peculiar connection with the transaction, would be proper. The theory of the defense was that it was not the intention of the Mandan Bank to advance any money to Mr. Hellstrom for his benefit, but that the bank was taking over the land so as to protect itself on a prior indebtedness which Hellstrom owed to it. And it was the further theory of the defendant that the Mandan Bank actually did, a couple of months later, take over this land for the benefit of itself, and also for the benefit of the plaintiff, and that therefore the plaintiff stood in no worse position at the time of the trial than if the redemption had been effected as claimed by him under his alleged agreement. It seems to us that if on cross-examination of this witness these facts could have been developed it would have constituted an effectual bar to the plaintiff's right of recovery, and while it was matter purely defensive *Page 174 
and perhaps part of the defendant's case-in-chief, still the plaintiff, by calling the witness Wilson and making him his witness for the purpose of showing the negotiation of the loan and the readiness to effect the redemption and the tender of the money, that the defendant then had the right to cross-examine such witness into all the surrounding facts and circumstances which could throw any light upon the transaction and aid in arriving at the exact truth, so that the jury might not be in the dark as to just what the relationship was between the Mandan bank and the plaintiff and what interest the Mandan bank had in the matter, and whether it had actually taken over this land for the benefit of the plaintiff.
Assignment of error No. 7 relates to an objection sustained by the court to a question asked the plaintiff, Hellstrom, on redirect examination as to how many feet of lumber would be had off of the timber on the Polk county land in 1922. If this constituted error it was immaterial, because the plaintiff was subsequently allowed to answer such question.
Assignments of error Nos. 8 and 9, with reference to the refusal of the court to permit the witness Torgerson to give his opinion as to the value of the Polk county land in 1922 are without foundation, it clearly appearing that Torgerson was not competent to give an opinion, not having seen the land or had anything to do with it since the year 1906.
Assignments of error Nos. 10 and 11 relate to the testimony of the witness A.F. Lahr, president of the defendant bank. He was permitted to testify as to what in his opinion was the reasonable market value of the Polk county land in 1922.
The plaintiff insists that no proper foundation was laid for the reception of this testimony. That it was erroneously received by the trial court solely upon the theory that under the general rule an owner of real estate may ordinarily give an opinion as to its value, and upon the further theory that the witness A.F. Lahr being the president of the banking corporation owning the land, that he therefore represented the owner and came within the rule.
Appellant urgently contends:
(1) That the rule of law applying to an owner of real estate does not apply to an officer of a corporation, and that Mr. Lahr could not give an opinion as to the value of this land unless he qualified himself *Page 175 
as an expert witness by showing that he was actually familiar with the market value of the land in Polk County, Minnesota, on the first day of July, 1922.
(2) That even if it be conceded that a president or managing officer of a corporation might come within the rule of law permitting an owner of real estate to give an opinion as to its value without the qualifications required of an expert witness, yet in this case the witness Lahr did not show sufficient knowledge of market value to qualify even as owner, for the reason that he had never resided upon the land, had never lived in the community where the property was located, and his information was not based upon any knowledge of actual sales of farm lands in that community, and his information as to its value was entirely hearsay.
Touching the right of an owner of real estate to testify as to its value, our supreme court, in McCaffery v. Northern P.R. Co.22 N.D. 544, 134 N.W. 749, makes the following statement:
"The plaintiff was the owner of the land burned over. After counsel for defendant had, on examination of the plaintiff, confused him as to how he would apportion any damage suffered between the injury to the trees and other alleged damage sustained, and demonstrated plaintiff to have been somewhat ignorant as to the actual value of his own farm and property injured, plaintiff was permitted, over objection as to foundation and incompetency to testify to value of the land, both before and after the fire, as proof of damages sustained. This ruling is assigned as error; defendant contending that `the presumption that an owner can testify as to the value of his own property is overcome by his positive testimony of ignorance of value.' The fallacy of this is that it is based upon a mistaken assumption of law that the right of an owner of property to testify depends upon some presumption of fact arising from the ownership qualifying him as an expert to testify; whereas his qualification to testify does not depend upon presumption, but upon the principle that an owner is, in law, qualified to testify, and his testimony is, because of his relationship as owner, competent and admissible on the question of value of his property. His ownership, regardless of his knowledge, qualifies him to testify. Its weight may in fact be naught, but he may testify to his estimate of the value of his property. See 17 Cyc. 112: `In most instances an owner is *Page 176 
deemed qualified by that relationship to testify to the value of common classes of property, although experience will enhance the weight of his estimate. The primary qualification of other witnesses is adequate acquaintance with that class of property, whether personal or real.' To the same effect, see Wigmore on Evidence, § 716, reading: `The owner of an article, whether he is generally familiar with such values or not, ought certainly be allowed to estimate its worth; the weight of his testimony (which often would be trifling) may be left to the jury; and courts have usually made no objections to this policy.' See also § 714, and 13 Enc. Ev. 560."
The general rule is also laid down in 22 C.J. p. 586, § 685, as follows:
"The owner of real estate is assumed to possess sufficient acquaintance with it to estimate the value of the property, and his estimate is therefore received, although his knowledge on the subject is not such as would qualify him to testify if he were not the owner. This rule applies even though the property is of an unusual character, and extends to receiving the statement of the owner as to the value of the right to use the property. He may also state the effect on value of a taking or other change in condition, and may, where the matter is one of mere subtraction or easy calculation, state the damage or cost of repair. Butownership alone does not qualify one who is not familiar with thelocation, quality, or value of his real estate."
In the case of Port Townsend Southern R. Co. v. Nolan, 48 Wn. 382, 93 P. 528, the Court said:
"The owner who occupies his property, and is familiar with its character and the purpose for which it may be used, and to a greater or less extent with land values in the community, is a competent witness. But the owner may have acquired the property by devise or descent in a distant state or country, and know nothing of its location, quality, condition, or value, and in such cases it is idle to contend that he is competent to testify to its value, or to any other fact concerning it. While, therefore, the owner may and often does occupy a different position towards his property than does a mere stranger, yet he must in all cases show at least some qualification before testifying to its value, and the difference between the qualifications required of the owner and of a stranger is one of degree only." *Page 177 
To the same effect, see Needham v. H.S. Halvorson Co. 22 N.D. 594, 135 N.W. 203.
We know of no reason why the salutary rule of evidence which permits an owner of real estate to testify to its value, upon showing the qualifications required of such owner, should not apply to the managing officer of a corporation owning real estate, if such officer shows sufficient knowledge of market value to bring him within the rule. Counsel have cited no authorities to the contrary, and we have found none. Therefore, if the witness Lahr has shown the same knowledge of the market value of this land which would be required of him if he were the individual owner of the same, it should be sufficient.
An analysis of his testimony discloses the following facts: That at the time of the trial he had been president of the First Guaranty Bank since its organization, some seven or eight years, and in active control and management of its affairs. That he had had about ten years' experience in appraising farm lands in North Dakota, and in making real estate loans, and was president and managing officer of the Investors Mortgage Security Company, and appraiser for the latter company. That he had personal charge of the Hellstrom transaction, and took the $3,000 mortgage for the bank in 1919, knew of the prior mortgage to the Capital Trust 
Savings Bank, and of the foreclosure of this mortgage. That about July 1, 1922, he made a trip to Polk County, Minnesota, for the special purpose of examining the Hellstrom land. At that time he personally viewed the premises, ascertaining its location and character of the soil. Hs also made a careful inspection of the improvements, testifying as to the size of the buildings, the number of acres under cultivation, the number of acres in meadow and in timber, as to the well and fencing. At that time he made inquiry of the tenant residing upon the land, and of neighboring farmers, as to its value, talking also with real estate men, business men, and a banker at Fosston, and one Briske, an appraiser for the Federal Land Bank, to ascertain the value of this land in particular and as to land values generally in that community. At the trial he testified that in his opinion the reasonable market value of the land on the 29th of June, 1922, was $18 to $20 an acre.
We are satisfied that the evidence of the witness Lahr was admissible, and that sufficient foundation had been laid for its introduction. *Page 178 
He was managing the affairs of the corporation. He was particularly charged with handling transactions making it necessary for him to judge values of property such as the property in question. True, he had acquired a great deal of his knowledge of values by inquiry in the locality and thus basing it more or less upon hearsay. But this is not at all unusual, as most witnesses who testify to values, particularly market values, rely upon hearsay as a source of their knowledge.
Appellant has called our attention to the case of Company A, First Regiment v. Hughes, 49 N.D. 626, 193 N.W. 144. But the distinction between the Hughes case and the case at bar is very clear. In the Hughes case an attempt was made to qualify witnesses as to value solely on the ground that they were members of Co. A, or on the ground that they had at some time or other been directors, without showing that they had any familiarity with the business affairs of the Company.
From an examination of all the other assignments of error alleged by the plaintiff in his appeal, we are satisfied that they are without merit, and therefore the judgment entered on the verdict rendered in the lower court is accordingly affirmed.
BIRDZELL, BURKE, and JOHNSON, JJ., and COOLEY, Dist. J., concur.
CHRISTIANSON, Ch. J., and NUESSLE, J., being disqualified, did not participate; McKENNA and COOLEY, District Judges, sitting in their stead.